IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AUTOCAM CORPORATION;
AUTOCAM MEDICAL, LLC;
JOHN KENNEDY;
PAUL KENNEDY;                                    Case No.
JOHN KENNEDY IV;                                 Hon.
MARGARET KENNEDY; and
THOMAS KENNEDY

       Plaintiffs,

     v.

KATHLEEN SEBELIUS, Secretary of the
United States Department of Health and
Human Services; UNITED STATES DEPARTMENT
OF HEALTH AND HUMAN SERVICES;
HILDA SOLIS, Secretary of the United States
Department of Labor; UNITED STATES
DEPARTMENT OF LABOR; TIMOTHY
GEITHNER, Secretary of the United States
Department of the Treasury; and UNITED STATES
DEPARTMENT OF THE TREASURY,
          Defendants.

Jason C. Miller (P#76236)              Patrick T. Gillen (P#47456)
MILLER JOHNSON                          Fidelis Center for Law and Policy
Attorneys for Plaintiffs               CatholicVote Legal Defense Fund
250 Monroe Avenue, N.W., Suite 800     Attorney for Plaintiffs
PO Box 306                             1025 Commons Circle
Grand Rapids, Michigan 49501-0306      Naples, FL 34119
(616) 831-1700                         (734) 355-4728
millerj@millerjohnson.com              ptgillen@avemarialaw.edu

                                       Thomas Brejcha*
                                       Peter Breen*
                                       Thomas More Society
                                       Attorneys for Plaintiffs
                                       29 South LaSalle St. – Suite 440
                                       Chicago, IL 60603
                                       Tel. 312-782-1680
                                       tbrejcha@thomasmoresociety.org
                                       pbreen@thomasmoresociety.org
                                       *Application for admission to be filed.

## VERIFIED COMPLAINT AND DEMAND FOR INJUNCTIVE RELIEF

Comes now Plaintiffs Autocam Corporation and Autocam Medical Corporation, John Kennedy, Paul Kennedy, John Kennedy IV, Margaret Kennedy, and Thomas Kennedy (collectively "Plaintiffs"), by and through undersigned counsel, bring this Verified Complaint against the above-named Defendants, and in support thereof state the following:

## NATURE OF THE ACTION

1.      This case presents constitutional and statutory challenges to administrative regulations ("the Mandate") ostensibly issued under the "Patient Protection and Affordable Care Act" (Pub. L. 111-148, March 23, 2010, 124 Stat. 119) and the "Health Care and Education Reconciliation Act" (Pub. L. 111-152, March 30, 2010, 124 Stat. 1029) (collectively known and hereinafter referred to as the "Affordable Care Act"), which force the Plaintiffs to pay for and facilitate access to drugs and services which the Plaintiffs believe to be intrinsically wrong and gravely sinful in light of their sincerely held religious convictions. Plaintiffs object to the Mandate because it compels them to violate deeply held religious convictions and subsidize speech with which they disagree. As a result, the Mandate violates the right to religious liberty and free speech protected by the First Amendment as well as rights protected under federal law. Plaintiffs seek judicial relief that will prevent the Defendants from enforcing the tyrannical Mandate and thereby redress the violation of their rights demonstrated herein.

2.      The Affordable Care Act mandates that health plans "provide coverage for and shall not impose any cost sharing requirements for . . . with respect to women, such additional preventive care and screenings . . . as provided for in comprehensive guidelines supported by the Health Resources and Services Administration" and directs the Secretary of the United States Department of

Health and Human Services to determine what would constitute "preventative care" under the mandate. 42 U.S.C § 300gg–13(a)(4).

3.　　Without meaningful notice of rulemaking or opportunity for public comment, the United States Department of Health and Human Services, the United States Department of Labor, and the United States Department of Treasury adopted the Institute of Medicine ("IOM") recommendations in full and promulgated the Mandate as an interim final rule that requires that all "group health plan[s] and . . . health insurance issuer[s] offering group or individual health insurance coverage" provide all FDA-approved contraceptive methods, including abortifacient contraception, and sterilization procedures. 76 Fed. Reg. 46621 (published Aug. 3, 2011); 45 C.F.R. § 147.130.

4.　　The Health Resources and Services Administration issued guidelines adopting the IOM recommendations. (http://www.hrsa.gov/womensguidelines).

5.　　Under the IOM guidelines, the Mandate requires *all* insurance insurers to provide not only sterilization and contraception but also abortions, because certain drugs and devices such as the "Plan B," known as the "morning-after pill,"and "ella," known as the "week-after pill," come within the Mandate's and Health Resources and Services Administration's definition of "Food and Drug Administration-approved contraceptive methods" despite their known abortifacient mechanisms of action, as well as sterilization methods approved by the FDA.

6.　　Thus, the Mandate requires covered group health plans and health insurance issuers to provide contraception, including abortifacient contraception, and sterilization services, as well as counseling relating to the same, in all of its insurance plans, group and individual.

7.　　The Mandate from the United States Department of Health and Human Services forces the Plaintiffs to choose between their sincerely held religious beliefs and civil penalties. By virtue of their sincerely held religious convictions the Plaintiffs believe that each human person is created in the image and likeness of God and must be protected from the moment of conception to

the moment of natural death. Plaintiffs further believe that human sexuality is a gift from God designed to unite spouses in marriage and transmit human life. As a result of these sincerely held religious beliefs Plaintiffs cannot provide, facilitate access to, subsidize, or cooperate with the provision of, drugs or services that facilitate contraception, including abortifacient contraception, or sterilization, because to do so would be cooperation with practices they sincerely believe to be gravely wrong and sinful.

8.      The Mandate, if left unchecked, forces Plaintiffs to violate their religious beliefs because it requires them to provide drugs and services contrary to their deeply held religious beliefs or pay ruinous fines which would total sixty-six thousand dollars per day of noncompliance ($66,000) or twenty-four million dollars ($24,000,000) a year.

9.      Plaintiffs seek a declaration that the Mandate violates their rights as well as a preliminary and permanent injunction enjoining Defendants from implementing and enforcing provisions of the regulations promulgated under the Affordable Care Act, specifically the Mandate, so that they can continue to conduct their business operations in a manner that is consistent with their sincerely held religious convictions.

10.     Plaintiffs bring this action to vindicate not only their own rights, but also to protect the rights of all Americans who care about our constitutional guarantees of free exercise of religion and freedom of speech, as well as the protection of innocent human life and the sanctity of marriage.

## JURISDICTION AND VENUE

11.     This action in which the United States is a defendant arises under the Constitution and laws of the United States. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331 and 1346.

12.     Plaintiffs' claims for declaratory and preliminary and permanent injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil

Procedure, by 28 U.S.C. § 2000bb-1, and by the general legal and equitable powers of this Court.

13.     Venue is proper under 28 U.S.C. § 1391(e) because this is the judicial district in which Plaintiffs are located.

## PLAINTIFFS

14.     Plaintiff Autocam is a Michigan corporation with its registered office located at 4436 Broadmoor SE, Kentwood, MI 49512.

15.     Plaintiff Autocam Medical is a Michigan limited liability corporation with its registered office located at 4436 Broadmoor SE, Kentwood, MI 49512.

16.     The Autocam Plaintiffs are West-Michigan based manufacturing companies that, along with their subsidiaries, have 14 facilities worldwide and over 1,500 employees, 661 of whom work in the United States of America, of which 478 are employed by Autocam and 183 are employed by Autocam Medical.

17.     John Kennedy is the President and Chief Executive Officer of Autocam and is an owner of Autocam. He has the responsibility for setting all policies governing the conduct of all phases of business of Autocam, including decisions concerning insurance. He resides in the Western District of Michigan.

18.     Plaintiff Margaret Kennedy resides in the Western District of Michigan and is an owner of Autocam.

19.     Plaintiff Thomas Kennedy resides in the Western District of Michigan and is an owner of Autocam.

20.     Plaintiff John Kennedy IV is an owner of Autocam residing outside the district.

21.     Plaintiff Paul Kennedy is an owner of Autocam residing outside the district.

22.     The Kennedy Plaintiffs own and control the Autocam Plaintiffs.

23. The Kennedy Plaintiffs with a controlling interest in the Autocam Plaintiffs object to the Mandate.

## DEFENDANTS

24. Defendants are appointed officials of the United States government and United States governmental agencies responsible for issuing the Mandate.

25. Defendant Kathleen Sebelius is the Secretary of the United States Department of Health and Human Services ("HHS"). In this capacity, she has responsibility for the operation and management of HHS. Defendant Sebelius is sued in her official capacity only.

26. Defendant HHS is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the regulation that is the subject of this lawsuit.

27. Defendant Hilda Solis is the Secretary of the United States Department of Labor. In this capacity, she holds responsibility for the operation and management of the United States Department of Labor. Defendant Solis is sued in her official capacity only.

28. Defendant United States Department of Labor is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the regulation that is the subject of this lawsuit.

29. Defendant Timothy Geithner is the Secretary of the United States Department of the Treasury. In this capacity, he holds responsibility for the operation and management of the United States Department of Treasury. Defendant Geithner is sued in his official capacity only.

30. Defendant United States Department of Treasury is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the regulation that is the subject of this lawsuit.

## FACTUAL ALLEGATIONS

**Plaintiffs' Religious Beliefs and Business Operations.**

31.     Plaintiffs are adherents of the Catholic faith as defined by the Magisterium (teaching authority) of the Catholic Church. These teachings prohibit the Plaintiffs from participating in, paying for, training others to engage in, or otherwise cooperating in the practice of contraception, including abortifacient contraception, and sterilization.

32.     Plaintiffs' sincerely held religious convictions also prevent them from adopting the spurious position that their religious beliefs do not apply when they enter the world of work. Quite the contrary, Plaintiffs believe that they are called to live out the teachings of Christ in their daily activity and witness to the truth of the Gospel by treating others in a manner that reflects their commitment to human dignity.

33.     Plaintiffs Autocam and Autocam Medical are for-profit corporations that merely represent the business form through which the individual Plaintiffs endeavor to live their vocation as Christians in the world.

34.     The Autocam Plaintiffs are self-insured and provide health benefits to their employees by virtue of a jointly administered benefits plan which features a group insurance plan used to provide benefits to full-time employees.

35.     Plaintiffs have earnestly endeavored over the years to provide their employees with high quality employee health coverage. Plaintiffs recognize that this is a practical need insofar as they must be able to attract skilled employees in order for them to remain in business.

36.     But precisely because Plaintiffs seek to live their Christian vocation as individuals who do not check their religious beliefs at the door of the workplace, they have gone above and beyond the minimal requirements of the market in their treatment of their employees. For example, Autocam's benefits plan is designed so that the employee is not charged a premium and ninety-one

percent (91%) of its current employees pay no premiums at present; Autocam gives its employees fifteen hundred dollars ($1,500) toward meeting the plan's deductible and advances funds to employees in need; Autocam's benefits plan includes a wellness feature recently selected to the Honor Roll of the 2012 Michigan's Healthiest Employers program; and Autocam's program covers one hundred percent (100%) of the cost of employees' preventive care, including health maintenance exams, including X-rays, scans, gynecological exams, and screenings, pre-natal, post-natal, and well-baby care. In these and other ways Autocam seeks to recognize and support the dignity of their employees.

37.     Despite their evident desire to support the health and well-being of employees Plaintiffs cannot provide, fund, or participate in health care insurance that covers artificial contraception, including abortifacient contraception, sterilization, and related education and counseling, without violating Plaintiffs' deeply held religious beliefs. If they did so, the Plaintiffs would contradict the very set of core religious convictions that inspire their efforts to treat employees well.

38.     For these reasons Plaintiffs have taken great pains through the years to ensure that its employees' insurance plans do not cover the objectionable drugs or services at issue here, i.e., contraception, including abortifacient contraception, and sterilization.

39.     Plaintiffs specifically designed a health insurance plan to exclude contraception, including abortifacient contraception, sterilization, and counseling relating to the same, precisely because Plaintiffs seek to do business in a manner fully consistent with their religious convictions.

40.     Plaintiffs have always taken great care to do so because as a self-insuring entity the Plaintiffs play a direct role in paying for the drugs and services used by their employees. The Plaintiffs cut the check that pays for expenses which means that Plaintiffs would be forced to pay for drugs and procedures directly contrary to their religious convictions .

41.     The Mandate effectively strips the Plaintiffs of their ability to provide employee benefits in a manner that is consistent with their sincerely held religious convictions. If Plaintiffs do not comply with the mandate then the Autocam Plaintiffs, which have 682 employees in the United States and 1,500 world-wide would become liable for fines in excess of twenty-four million dollars ($24,000,000), effectively crippling the Plaintiffs' business.

42.     The Autocam Plaintiffs' insurance plans are not considered "grandfathered" due to unrelated changes made on January 1, 2011.

43.     The Autocam Plaintiffs' insurance is not subject to any "safe harbor" provision.

44.     Due to the Mandate, Plaintiffs will no longer be allowed to exclude objectionable drugs and services from their benefits plan—and will be forced to provide and pay for these services that violate their religious beliefs.

45.     The Autocam Plaintiffs' next plan year starts January 1, 2013.

46.     Plaintiffs wish to conduct their business in a manner that does not violate the principles of their religious faith.

**The Affordable Care Act**

47.     The Affordable Care Act regulates the national health insurance market by directly regulating "group health plans" and "health insurance issuers." The Affordable Care Act does not apply equally to all insurers or to all individuals.

48.     The Affordable Care Act requires employers with more than 50 full-time employees or full-time employee equivalents to provide federal government-approved health insurance or pay a substantial per-employee fine. (26 U.S.C. § 4980H).

49.     Plaintiffs Autocam employ well over 50 full-time employees in Michigan alone and must provide federal government-approved health insurance under the Affordable Care Act or pay

substantial per-employee fines.

50.     Certain provisions of the Affordable Care Act do not apply equally to members of certain religious groups. *See, e.g.*, 26 U.S.C. § 5000A(d)(2)(a)(i) and (ii) (individual mandate does not apply to members of "recognized religious sect or division" that conscientiously objects to acceptance of public or private insurance funds); 26 U.S.C. § 5000A(d)(2)(B)(ii) (individual mandate does not apply to members of "health care sharing ministry" that meets certain criteria).

51.     Plaintiffs do not qualify for an individual exemption under 26 U.S.C. § 5000A(d)(2)(a)(i) and (ii) as Plaintiffs do not object to acceptance of public or private insurance funds in their totality and currently enjoy health insurance benefits that exclude contraceptives, sterilization, abortion, and abortifacients.

52.     The Affordable Care Act's preventive care requirements do not apply to employers who provide so-called "grandfathered" health care plans. Employers who follow HHS guidelines may continue to use grandfathered plans indefinitely.

53.     Plaintiffs' current insurance plans do not qualify as "grandfathered" health care plans, and are considered "non-grandfathered." Furthermore, Plaintiffs do not qualify for the "religious employer" exemption contained in 45 CFR § 147.130 (a)(1)(A) and (B). Since the Plaintiffs do not qualify for the "religious employer" exemption, they are not permitted to take advantage of the "temporary safe-harbor" as set forth by the Defendants at 77 Fed. Register 8725 (Feb. 15, 2012).

54.     Plaintiffs are subject to the Mandate now and must choose between complying with the requirements of the Affordable Care Act in violation of their religious beliefs or paying ruinous fines that would have a crippling impact on their ability to survive economically.

55.     Plaintiffs are confronted with complying with the requirements of the Affordable Care Act in violation of their religious beliefs or removing themselves from the health insurance market in its entirety—endangering the health and economic stability of Autocam, its employees, and

its employees' families. Indeed, Plaintiffs' current analysis indicates that about half of their employees will become exposed to a premium of sixteen thousand dollars ($16,000) and made liable for up to twelve thousand dollars ($12,000) in costs per year. Other employees will become exposed to a penalty between six-hundred and ninety-five dollars ($695) and over two thousand dollars ($2,000) per year or 2.5% of income (whichever is higher), banking on their ability to purchase coverage after an incident. Plaintiffs must make this decision by November 1, 2012 in order to be able to roll it out to employees on January 1, 2013 so as to comply with federal deadlines relating to plan changes.

56.     The Affordable Care Act is not generally applicable because it provides for numerous exemptions from its rules. The Affordable Care Act is not neutral because some groups, both secular and religious, enjoy exemptions from the law, while certain religious groups do not. Some groups, both secular and religious, have received waivers from complying with the provisions of the Affordable Care Act, while others—such as the Plaintiffs—have not.

57.     The Affordable Care Act creates a system of individualized exemptions. Under the Affordable Care Act, the United States Department of Health and Human Services has the authority under the Affordable Care Act to grant compliance waivers ("HHS waivers") to employers and other health insurance plan issuers. HHS waivers release employers and other plan issuers from complying with the provisions of the Affordable Care Act. HHS decides whether to grant waivers based on individualized waiver requests from particular employers and other health insurance plan issuers. Upon information and belief, more than a thousand HHS waivers have been granted.

**The "Preventive Care" Mandate**

58.     A provision of the Affordable Care Act mandates that health plans "provide coverage for and shall not impose any cost sharing requirements for . . . with respect to women, such additional preventive care and screenings . . . as provided for in comprehensive guidelines supported

by the Health Resources and Services Administration" and directs the Secretary of United States Department of Health and Human Services to determine what would constitute "preventative care" under the mandate. 42 U.S.C § 300gg–13(a)(4).

59.    On July 19, 2010, HHS, along with the United States Department of Treasury and the United States Department of Labor, published an interim final rule under the Affordable Care Act. 75 Fed. Reg. 41726 (2010). The interim final rule required providers of group health insurance to cover preventive care for women as provided in guidelines to be published by the Health Resources and Services Administration at a later date. 75 Fed. Reg. 41759 (2010).

60.    On February 15, 2012, the United States Department of Health and Human Services promulgated a Mandate that group health plans include coverage for all Food and Drug Administration-approved contraceptive methods and procedures, patient education, and counseling for all women with reproductive capacity in plan years beginning on or after August 1, 2012. *See* 45 CFR § 147.130 (a)(1)(iv), as confirmed at 77 Fed. Register 8725 (Feb. 15, 2012), adopting and quoting Health Resources and Services Administration ("HRSA") Guidelines, (http://www.hrsa.gov/womensguidelines).

61.    The Mandate was enacted pursuant to statutory authority under the Affordable Care Act.

62.    In its ruling, HHS included all FDA-approved contraceptives under the banner of preventive services, including contraception, abortion, and abortifacients such as the "Plan B," known as the "morning-after pill," and "ella," known as the "week-after pill," which operate in a manner similar to the abortion pill RU-486. (http://www.hrsa.gov/womensguidelines).

63.    The Mandate's reach seeks to control the decisions of employers, individuals, and also the decisions of *all* insurance issuers. *See* 42 USC § 300gg-13 (a)(1),(4). *All* insurance issuers are mandated to include contraception, sterilization, abortion, and abortifacients such as the

"morning-after pill," "Plan B," and "ella" in *all* of its group *and* individual plans, not specifically exempted, beginning as of August 1, 2012.

64.     Individuals and employers, regardless of the number of employees they employ, will eventually be forced to select an insurance plan that includes what HHS deemed "preventative care." All individuals and employers will be stripped of their choice not to pay for the "preventative care," regardless of whether paying for such "services" violates one's conscience or deeply held religious beliefs.

65.     The Mandate reaches even further than the Affordable Care Act to eliminate all employers and individuals from selecting a health insurance plan in which the insurance issuers do not automatically provide contraception, sterilization, abortion, and abortifacients.

66.     Prior to promulgating the Mandate, HHS accepted public comments to the 2010 interim final regulations from July 19, 2010 to September 17, 2010. Upon information and belief, a large number of groups filed comments, warning of the potential conscience implications of requiring religious individuals and groups to pay for certain kinds of services, including contraception, including abortifacient contraception, and sterilization..

67.     HHS directed a private health policy organization, the IOM, to suggest a list of recommended guidelines describing which drugs, procedures, and services should be covered by all health plans as preventative care for women.     (http://www.hrsa.gov/womensguidelines).     In developing its guidelines, IOM invited a select number of groups to make presentations on the preventive care that should be mandated by all health plans. These groups were the Guttmacher Institute, the American Congress of Obstetricians and Gynecologists (ACOG), John Santelli, the National Women's Law Center, National Women's Health Network, Planned Parenthood Federation of America, and Sara Rosenbaum. All of these groups are notorious supporters of abortion, contraception, including abortifacient contraception, and sterilization.

68.     No groups that oppose government-mandated coverage of contraception, sterilization, abortifacients, abortion, and related education and counseling were among the invited presenters.

69.     One year after the first interim final rule was published, on July 19, 2011, the IOM published its recommendations. It recommended that the preventative services include "All Food and Drug Administration approved contraceptive methods." (Institute of Medicine, Clinical Preventive Services for Women: Closing the Gaps (July 19, 2011))

70.     Preventative services therefore include FDA-approved contraceptive methods such as birth-control pills; prescription contraceptive devices, including IUDs; Plan B, also known as the "morning-after pill"; and ulipristal, also known as "ella" or the "week-after pill"; and other drugs, devices, and procedures.

71.     Plan B and "ella" can prevent the implantation of a human embryo in the wall of the uterus and can cause the death of an embryo. The use of artificial means to prevent the implantation of a human embryo in the wall of the uterus or to cause the death of an embryo each constitute an "abortion" as that term is used in federal law and Catholic teaching. Consequently, Plan B and "ella" are abortifacients.

72.     Thirteen days later, on August 1, 2011, without notice of rulemaking or opportunity for public comment, HHS, the United States Department of Labor, and the United States Department of Treasury adopted the IOM recommendations in full and promulgated the Mandate. The Health Resources and Services Administration issued guidelines adopting the IOM recommendations. (http://www.hrsa.gov/womensguidelines).

73.     The Mandate also requires group health care plans and insurance issuers to provide education and counseling for all women beneficiaries with reproductive capacity relating to drugs and services connected with abortion, contraception, including abortifacient contraception, and sterilization.

74.     The Mandate went into effect immediately as an interim final rule.

75.     HHS did not take into account the concerns of religious organizations in the comments submitted before the Mandate was issued. Instead the Mandate was unresponsive to the concerns stated in the comments submitted by religious organizations.

76.     When it issued the Mandate, HHS requested comments from the public by September 30 and indicated that comments would be available online. Upon information and belief, over 100,000 comments were submitted against the Mandate. On October 5, 2011, six days after the comment period ended, Defendant Sebelius gave a speech at a fundraiser for NARAL Pro-Choice America. She told the assembled crowd that "we are in a war." She did not state whom she and NARAL Pro-Choice America were warring against.

77.     During a congressional hearing on April 26, 2012, Defendant Sebelius admitted that she is totally unfamiliar with the United States Supreme Court religious freedom cases. Defendant Sebelius showed little concern for the constitutional issues involved in promulgating the Mandate. At the aforementioned congressional hearing, she admitted that prior to issuing the Mandate she did not review any written materials or any sort of legal memo from her general counsel discussing the effects of the Mandate on religious freedom.

78.     The Mandate fails to take into account the statutory and constitutional conscience rights of individuals who own and operate for-profit companies but dictates that such individuals must check their religious convictions at the door of the workplace, an approach that is inimical to the great tradition of religious liberty at the heart of the American experiment in self-government.

79.     The Mandate requires that Plaintiffs assist, provide, and fund coverage for contraception, including abortifacient contraception, sterilization, and related education and counseling against their conscience in a manner that is contrary to law.

80.     The Mandate pressures Plaintiffs to change or violate their religious beliefs or suffer

adverse consequences in terms of fines or disadvantages that undermine its ability to conduct business on competitive terms with regard to recruitment and retention of competent employees.

81.     The Mandate places the Autocam Plaintiffs at a competitive disadvantage in their efforts to recruit and retain employees and members.

82.     The Mandate forces Plaintiffs to provide, fund, and assist its employees and plan participants in the purchase of drugs and services, including counseling, relating to use of contraception, including abortifacient drugs, and drugs, services, and sterilization in violation of Plaintiffs' religious beliefs that doing so is gravely immoral and sinful.

83.     Plaintiffs sincerely believe that if they comply with the mandate they will be guilty of material cooperation of evil, which constitutes a mortal sin that subjects them to eternal damnation. Put another way, Plaintiffs sincerely believe that compliance with the Mandate will deprive them of their ability to share eternal salvation.

84.     Plaintiffs have a sincere religious objection to providing coverage for emergency contraceptive drugs such as Plan B and "ella" since they believe those drugs could prevent a human embryo, which they understand to include a fertilized egg before it implants in the uterus, from implanting in the wall of the uterus, causing the death of a person.

85.     Plaintiffs consider the prevention by artificial means of the implantation of a human embryo to be an abortion. Plaintiffs believe that Plan B and "ella" can cause the death of the embryo, which is a person. Plan B can prevent the implantation of a human embryo in the wall of the uterus. "Ella" can prevent the implantation of a human embryo in the wall of the uterus. Plan B and "ella" can cause the death of the embryo. The use of artificial means to prevent the implantation of a human embryo in the wall of the uterus constitutes an "abortion" as that term is used in federal law. The use of artificial means to cause the death of a human embryo constitutes an "abortion" as that term is used in federal law.

86.     The Mandate forces Plaintiffs to provide emergency contraception, including Plan B and "ella," free of charge, regardless of the ability of insured persons to obtain these drugs from other sources.     The Mandate further forces Plaintiffs to fund education and counseling concerning contraception, sterilization, abortifacients, and abortion that directly conflicts with Plaintiffs' religious beliefs and teachings.

87.     Plaintiffs cannot cease providing its employees with health insurance coverage without violating their sincere religious conviction that they should take all reasonable steps to support the health and well-being of their employees and their families, particularly given the Plaintiffs knowledge that their employees would be unable to attain similar coverage in the market as it now exists.

88.     The Mandate forces Plaintiffs to choose among violating their religious beliefs, incurring substantial fines, or terminating their employee or individual health insurance coverage.

89.     The Mandate forces Plaintiffs to choose among violating their religious beliefs, incurring substantial fines, or terminating their employee or individual health insurance coverage.

90.     Plaintiffs have already had to devote significant institutional resources, including both staff time and funds, to determine how to respond to the Mandate.     Plaintiffs anticipate continuing to make such expenditures of time and money.

**The Narrow Discretionary Religious Exemption**

91.     The Mandate indicates that the HRSA "may" grant religious exemptions to certain religious employers. 45 C.F.R. § 147.130(a)(iv)(A).

92.     The Mandate allows HRSA to grant exemptions for "religious employers" who "meet[ ] all of the following criteria: (1) The inculcation of religious values is the purpose of the organization. (2) The organization primarily employs persons who share the religious tenets of the organization. (3) The organization serves primarily persons who share the religious tenets of the

organization. (4) The organization is a nonprofit organization as described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended." 45 C.F.R. § 147.130(a)(iv)(B).

93. The Mandate imposes no constraint on HRSA's discretion to grant exemptions to some, all, or none of the organizations meeting the Mandate's definition of "religious employers." HHS stated that it based the exemption on comments on the 2010 interim final rule. 76 Fed. Reg. 46621.

94. Although Plaintiffs run their company in a manner consistent with their religious convictions, they are not a religious employer as defined by the law.

95. Plaintiffs have confirmed that they will be subject to the Mandate despite the existence of exemptions to the Mandate as none of the exemptions apply to them.

96. It is inevitable given the current state of the law that Plaintiffs will have to comply with the Mandate, despite the fact that Plaintiffs will violate the teachings of their religious beliefs and the teachings of their Catholic faith by directly providing, funding, and/or allowing its members to engage in disseminating information and guidance about where to obtain sterilization, contraception, abortion, or abortifacient services.

**The Mandate's Illegality**

97. The Mandate issued by the Defendants does not accommodate the Plaintiffs' religious beliefs, which are longstanding religious convictions shared by millions of other Americans.

98. The Mandate not only forces Plaintiffs to finance contraception, abortifacients, abortion, sterilization, and related education and counseling, but also subverts the expression of Plaintiffs' religious beliefs, and the beliefs of millions of other Americans, by forcing Plaintiffs to fund, promote, and assist others to acquire and use drugs and services which Plaintiffs believe

involve gravely immoral practices, including the destruction of innocent human life.

99.     The Mandate unconstitutionally coerces Plaintiffs to violate their deeply held religious beliefs under threat of directly violating their consciences, in addition to any imposed fines and penalties. The Mandate also forces Plaintiffs to fund government-dictated speech that is directly at odds with their own speech and religious beliefs. Having to pay a fine to the taxing authorities or being entirely forced out of the insurance market in order to ensure the privilege of practicing one's religion or controlling one's own speech substantially burdens Plaintiffs' religious liberty and freedom of speech under the First Amendment.

100.    Complying with the Mandate requires a direct violation of the Plaintiffs' religious beliefs because it would require Plaintiffs to pay for and assist others in paying for or obtaining not only contraception and sterilization but also abortion, because certain drugs and devices such as "Plan B," and "ella" come within the Mandate's and Health Resources and Services Administration's definition of "Food and Drug Administration-approved contraceptive methods" despite their known abortifacient mechanisms of action.

101.    The Defendants' refusal to accommodate the conscience of the Plaintiffs, and of other Americans who share the Plaintiffs' religious views, is highly selective. Numerous exemptions exist in the Affordable Care Act which appear arbitrary and were granted to employers who purchase group insurance. This evidences that Defendants do not mandate that all insurance plans need to cover "preventative services" (e.g., the thousands of waivers from the Affordable Care Act issued by Defendants for group insurance based upon the commercial convenience of large corporations, the age of the insurance plan, or the size of the employer).

102.    Although the Defendants have granted waivers to those whose requests they believe are "legitimate" no exemption exists for an employer or individual whose religious conscience instructs him that certain mandated services are immoral and gravely sinful. Defendants' plan fails

to give the same level of weight or accommodation to the exercise of one's fundamental First Amendment freedoms that it assigns to the yearly earnings of a corporation.

103.   The Defendants' actions violate Plaintiffs' right to freedom of religion, as secured by the First Amendment to the United States Constitution and civil rights statutes, including the Religious Freedom Restoration Act (RFRA).

104.   The Defendants' actions also violate Plaintiffs' right to the freedom of speech, as secured by the First Amendment to the United States Constitution.

105.   Furthermore, the Mandate is also illegal because it was imposed by Defendants without prior notice or sufficient time for public comment, and otherwise violates the Administrative Procedure Act, 5 U.S.C. § 553.

106.   Had Plaintiffs' religious beliefs, or the beliefs of the million other Americans who share Plaintiffs' religious beliefs been obscure or unknown, the Defendants' actions might have been an accident.  But because the Defendants acted with full knowledge of those beliefs, and because they arbitrarily exempt some plans for a wide range of reasons other than religious conviction, the Mandate can be interpreted as nothing other than a deliberate attack by the Defendants on the Catholic Church, the religious beliefs held by Plaintiffs, and the similar religious beliefs held by millions of other Americans. The Defendants have, in sum, intentionally used government power to force individuals to believe in, support, and endorse the mandated services manifestly contrary to their own religious convictions, and then to act on that coerced belief, support, or endorsement. Plaintiffs seek declaratory and injunctive relief to protect against this attack.

## CLAIMS

### COUNT I
**(Violation of the First Amendment to the United States Constitution – Free Exercise Clause)**

107.   Plaintiffs incorporate by reference all preceding paragraphs.

108.    Plaintiffs' sincerely held religious beliefs prohibit them from providing coverage for contraception, abortion, sterilization, and related education and counseling either directly or through entities that they own, operate, and control. Plaintiffs' compliance with these beliefs is a religious exercise.

109.    Neither the Affordable Care Act nor the Mandate is neutral.

110.    Neither the Affordable Care Act nor the Mandate is generally applicable.

111.    Defendants have created categorical exemptions and individualized exemptions to the Mandate.

112.    The Mandate furthers no compelling governmental interest.

113.    The Mandate is not the least restrictive means of furthering Defendants' stated interests.

114.    The Mandate creates government-imposed coercive pressure on Plaintiffs to change or violate their religious beliefs.

115.    The Mandate chills Plaintiffs' religious exercise.

116.    The Mandate exposes Plaintiffs Autocam to substantial fines for their religious exercise and, accordingly, imposes a substantial cost on their owners and operators for their religious exercise.

117.    The Mandate exposes Plaintiffs to monetary and health risks as they will no longer be able to purchase or provide health care insurance without violating their religious beliefs.

118.    The Mandate imposes a substantial burden on Plaintiffs' religious exercise.

119.    The Mandate is not narrowly tailored to any compelling governmental interest.

120.    The Mandate and Defendants' threatened enforcement of the Mandate violate Plaintiffs' rights secured to them by the Free Exercise Clause of the First Amendment to the United

States Constitution.

121.    Absent injunctive and declaratory relief against the Mandate, Plaintiffs have been and will continue to be harmed.

## COUNT II
### (Violations of the first Amendment to the United States Constitution – Free Exercise Clause)

122.    Plaintiffs incorporate by reference all preceding paragraphs.

123.    Plaintiffs' sincerely held religious beliefs prohibit them or a business under their ownership or control from voluntarily and knowingly purchasing or providing coverage for contraception, sterilization, abortifacients, abortion, and related education and counseling. Plaintiffs' compliance with these beliefs is a religious exercise.

124.    Despite being informed in detail of these beliefs beforehand, Defendants designed the Mandate and the religious exemption to the Mandate in a way that made it impossible for Plaintiffs to comply with their religious beliefs.

125.    Defendants promulgated both the Mandate and the religious exemption to the Mandate in order to suppress the religious exercise of Plaintiffs and others.

126.    The Mandate and Defendants' threatened enforcement of the Mandate thus violate Plaintiffs' rights secured to them by the Free Exercise Clause of the First Amendment of the United States Constitution.

127.    Absent injunctive and declaratory relief against the Mandate, Plaintiffs have been and will continue to be harmed.

## COUNT III
### (Violation of the First Amendment to the United States Constitution – Free Exercise Clause)

128.    Plaintiffs incorporate by reference all preceding paragraphs.

129.    By design, Defendants imposed the Mandate on some religious organizations or

religious individuals but not on others, resulting in discrimination among religions.

130.    The Mandate vests HRSA with unbridled discretion in deciding whether to allow exemptions to some, all, or no organizations meeting the definition of "religious employers."

131.    The Mandate vests HRSA with unbridled discretion in deciding whether to allow exemptions to some, all, or no religious individuals.

132.    The Mandate and Defendants' threatened enforcement of the Mandate thus violate Plaintiffs' rights secured to it by the Free Exercise Clause of the First Amendment of the United States Constitution.

133.    Absent injunctive and declaratory relief against the Mandate, Plaintiffs have been and will continue to be harmed.

**COUNT IV**
**(Violation of the First Amendment to the United States Constitution – Establishment Clause)**

134.    Plaintiffs incorporate by reference all preceding paragraphs.

135.    By design, defendants imposed the Mandate on some organizations and individuals but not on others, resulting in a selective burden on Plaintiffs.

136.    The Mandate vests HRSA with unbridled discretion in deciding whether to allow exemptions to some, all, or no organizations meeting the definition of "religious employers."

137.    The Mandate also vests HRSA with unbridled discretion in deciding whether to allow exemptions to some, all, or no individuals.

138.    The Mandate and Defendants' threatened enforcement of the Mandate therefore violates Plaintiffs' rights secured to it by the Establishment Clause of the First Amendment to the United States Constitution.

139.    Absent injunctive and declaratory relief against the Mandate, Plaintiffs have been and will continue to be harmed.

## COUNT V
### (Violation of the First Amendment to the United States Constitution – Freedom of Speech)

140. Plaintiffs incorporate by reference all preceding paragraphs.

141. Plaintiffs profess that contraception, sterilization, abortion, and abortifacients violate their religious beliefs.

142. The Mandate would compel Plaintiffs to provide or subsidize activities that Plaintiffs profess are violations of the Plaintiffs' religious beliefs.

143. The Mandate would compel Plaintiffs to fund and to provide education and counseling related to contraception, sterilization, abortion, and abortifacients.

144. Defendants' actions thus violate Plaintiffs' right to be free from compelled speech as secured to it by the First Amendment of the United States Constitution.

145. The Mandate's compelled speech requirement is not narrowly tailored to a compelling governmental interest.

146. Absent injunctive and declaratory relief against the Mandate, Plaintiffs have been and will continue to be harmed.

## COUNT VI
### (Violation of the First Amendment to the United States Constitution – Expressive Association)

147. Plaintiffs incorporate by reference all preceding paragraphs.

148. Plaintiffs support, contribute to, and affiliate with other individuals and organizations for that share a religious objection to contraception, sterilization, abortion, and abortifacients.

149. The Mandate would compel Plaintiffs to subsidize activities that are violations of Plaintiffs' religious beliefs.

150. The Mandate would compel Plaintiffs to fund and to provide education and counseling related to contraception, sterilization, abortion, and abortifacients.

151.    Defendants' actions thus violate Plaintiffs' right of expressive association as secured to by the First Amendment of the United States Constitution.

152.    Absent injunctive and declaratory relief against the Mandate, Plaintiffs have been and will continue to be harmed.

## COUNT VII
### (Violation of the First Amendment to the United States Constitution -- Free Exercise Clause and Freedom of Speech)

153.    Plaintiffs incorporate by reference all preceding paragraphs.

154.    By stating that HRSA "may" grant an exemption to certain religious groups, the Mandate vests HRSA with unbridled discretion over which organizations or individuals can have its First Amendment interests accommodated. *See* 26 U.S.C. § 5000A(d)(2)(a)(i)-(ii).

155.    The Mandate furthermore seems to have completely failed to address the constitutional and statutory implications of the Mandate on for-profit, secular employers such as Plaintiffs Autocam. As such, Plaintiffs Autocam and its owners and operators are subject to the unbridled discretion of HRSA to determine whether it would be exempt.

156.    Defendants' actions therefore violate Plaintiffs' right not to be subjected to a system of unbridled discretion when engaging in speech or when engaging in religious exercise, as secured to it by the First Amendment of the United States Constitution.

157.    Absent injunctive and declaratory relief against the Mandate, Plaintiffs have been and will continue to be harmed.

## COUNT VIII
### (Violation of the Religious Freedom Restoration Act)

158.    Plaintiffs incorporate by reference all preceding paragraphs.

159.    Plaintiffs' sincerely held religious beliefs prohibit them from providing or purchasing coverage for contraception, sterilization, abortion, abortifacients, and related education and

counseling. Plaintiffs' compliance with these beliefs is a religious exercise.

160.    The Mandate creates government-imposed coercive pressure on Plaintiffs to change or violate their religious beliefs.

161.    The Mandate chills Plaintiffs' religious exercise.

162.    The Mandate exposes Plaintiffs Autocam to substantial fines for their religious exercise and the religious exercise of their owners, thus causing financial injury to their owners.

163.    The Mandate imposes a substantial burden on Plaintiffs' religious exercise.

164.    The Mandate furthers no compelling governmental interest.

165.    The Mandate is not narrowly tailored to any compelling governmental interest.

166.    The Mandate is not the least restrictive means of furthering Defendants' stated interests.

167.    The Mandate and Defendants' threatened enforcement of the Mandate violate Plaintiffs' rights secured to it by the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.*

168.    Absent injunctive and declaratory relief against the Defendants, Plaintiffs have been and will continue to be harmed.

## COUNT IX
### (Violation of the Administrative Procedure Act)

169.    Plaintiffs incorporate by reference all preceding paragraphs.

170.    Defendants' stated reasons that public comments were unnecessary, impractical, and opposed to the public interest are false and insufficient, and do not constitute "good cause."

171.    Without proper notice and opportunity for public comment, Defendants were unable to take into account the full implications of the regulations by completing a meaningful "consideration of the relevant matter presented." Defendants did not consider or respond to the

voluminous comments they received in opposition to the interim final rule.

172.    Therefore, Defendants have taken agency action not in observance with procedures required by law, and Plaintiffs are entitled to relief pursuant to 5 U.S.C. § 706(2)(D).

173.    Absent injunctive and declaratory relief against the Mandate, Plaintiffs have been and will continue to be harmed.

## COUNT X
### (Violation of the Administrative Procedure Act)

174.    Plaintiffs incorporate by reference all preceding paragraphs.

175.    In promulgating the Mandate, Defendants failed to consider the constitutional and statutory implications of the mandate on Plaintiffs and similar companies and individuals.

176.    Defendants' explanation for its decision not to exempt Plaintiffs and similar employers and individuals from the Mandate runs counter to the evidence submitted by religious organizations during the comment period.

177.    Thus, Defendants' issuance of the interim final rule was arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) because the rules fail to consider the full extent of their implications and because they do not take into consideration the evidence against them.

178.    Absent injunctive and declaratory relief against the Mandate, Plaintiffs have been and will continue to be harmed.

## COUNT XI
### (Violation of the Administrative Procedure Act)

179.    Plaintiffs incorporate by reference all preceding paragraphs.

180.    The Mandate is contrary to the provisions of the Weldon Amendment of the Consolidated Security, Disaster Assistance, and Continuing Appropriations Act of 2009, Public Law 110 329, Div. A, Sec. 101, 122 Stat. 3574, 3575 (September 30, 2008).

181.    The Weldon Amendment provides that "[n]one of the funds made available in this Act [making appropriations for Defendants United States Department of Labor and United States Department of Health and Human Services] may be made available to a Federal agency or program . . . if such agency, program, or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions."

182.    The Mandate requires issuers, employers, and individuals, including Plaintiffs to provide and purchase coverage of all Federal Drug Administration-approved contraceptives.

183.    Some FDA-approved contraceptives cause abortions.

184.    As set forth above, the Mandate violates RFRA and the First Amendment.

185.    Under 5 U.S.C. § 706(2)(A), the Mandate is contrary to existing law, and is in violation of the Administrative Procedure Act.

186.    Absent injunctive and declaratory relief against the Mandate, Plaintiffs have been and will continue to be harmed.

## COUNT XII
### (Violation of the Administrative Procedure Act)

187.    Plaintiffs incorporate by reference all preceding paragraphs.

188.    The Mandate is contrary to the provisions of the Affordable Care Act.

189.    Section 1303(b)(1)(A) of the Affordable Care Act states that "nothing in this title"— i.e., title I of the Act, which includes the provision dealing with "preventive services"—"shall be construed to require a qualified health plan to provide coverage of [abortion] services . . . as part of its essential health benefits for any plan year."

190.    Section 1303 further states that it is "the issuer" of a plan that "shall determine whether or not the plan provides coverage" of abortion services.

191.    Under the Affordable Care Act, Defendants do not have the authority to decide whether a plan covers abortion; only the issuer does.

192.    However, the Mandate requires all issuers, including Plaintiffs and Plaintiffs' insurance issuer Blue Cross/Blue Shield of Michigan, to provide coverage of all Federal Drug Administration-approved contraceptives.

193.    Some FDA-approved contraceptives cause abortions.

194.    Under 5 U.S.C. § 706(2)(A), the Mandate is contrary to existing law, and is in violation of the Administrative Procedure Act.

195.    Absent injunctive and declaratory relief against the Mandate, Plaintiffs have been and will continue to be harmed.

## PRAYER FOR RELIEF

Wherefore, the Plaintiffs request that this honorable Court:

a.    Declare that the Mandate and Defendants' enforcement of the Mandate against Plaintiffs violates the First Amendment to the United States Constitution;

b.    Declare that the Mandate and Defendants' enforcement of the Mandate against Plaintiffs violates the Religious Freedom Restoration Act.

c.    Declare that the Mandate was issued in violation of the Administrative Procedure Act;

d.    Issue both a preliminary and a permanent injunction prohibiting and enjoining Defendants from enforcing the Mandate against Plaintiffs and other religious individuals, employers, and companies that object to funding and providing insurance coverage for contraceptives, sterilization, abortion, abortifacients, and related education and counseling;

e.    Award Plaintiffs the costs of this action and reasonable attorney's fees; and

f. Award such other and further relief as it deems equitable and just.

Respectfully submitted,

MILLER JOHNSON
Counsel for Plaintiffs

Dated: October 8, 2012

*/s/ Jason C. Miller*
Jason C. Miller (P#76236)
MILLER JOHNSON
Attorneys for Plaintiffs
250 Monroe Avenue, N.W., Suite 800
PO Box 306
Grand Rapids, Michigan 49501-0306
Telephone: (616) 831-1700

Patrick T. Gillen (P#47456)
Fidelis Center for Law and Policy
CatholicVote Legal Defense Fund
Attorney for Plaintiffs
1025 Commons Circle
Naples, FL 34119
(734) 355-4728
ptgillen@avemarialaw.edu

Thomas Brejcha*
Peter Breen*
Thomas More Society
Attorneys for Plaintiffs
29 South LaSalle St. – Suite 440
Chicago, IL 60603
Tel. 312-782-1680
tbrejcha@thomasmoresociety.org
pbreen@thomasmoresociety.org
*Application for admission to be filed.

## VERIFICATION

COUNTY OF KENT     )
                       ) ss
STATE OF MICHIGAN   )

Pursuant to 28 U.S.C. §1746 I declare under penalty of perjury of the laws of the United States

that the factual statements set forth above are true and accurate to the best of my knowledge,

information, and belief.

John Kennedy, individually and on behalf of Autocam
Corporation and Autocam Medical, LLC